**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **LARRY DANE DUHON,** | § | |
| Petitioner, | § | |
| | § | |
| **V.** | § | A-09-CA-623-LY |
| | § | |
| **RICK THALER, Director,** | § | |
| **Texas Dept. of** | § | |
| **Criminal Justice-Correctional** | § | |
| **Institutions Division,** | § | |
| Respondent. | § | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

TO:   THE HONORABLE LEE YEAKEL
      UNITED STATES DISTRICT JUDGE

The Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. §636(b) and Rule 1(e) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrates, as amended, effective December 1, 2002.

Before the Court are Petitioner's Application for Habeas Corpus Relief under 28 U.S.C. § 2254 (Document 1); Petitioner's brief in support (Document 2); Respondent's Answer (Document 13); Petitioner's response thereto (Document 15); and Petitioner's supplemental response (Document 17). Petitioner, proceeding pro se, has been granted leave to proceed in forma pauperis. For the reasons set forth below, the undersigned finds that Petitioner's application for writ of habeas corpus should be denied.

**STATEMENT OF THE CASE**

A.      **Petitioner's Criminal History**

According to Respondent, the Director has lawful and valid custody of Petitioner pursuant to a judgment and sentence of the County Court at Law No. 4 of Travis County, Texas, in cause number D-1-06-900255.  CR[1] at 45-46.  Petitioner was charged with assault, family violence to which he entered a plea of guilty.  CR at 21-23. On May 24, 2006, the court adjudged Petitioner guilty as charged and assessed punishment at eight years of imprisonment, probated for five years.  CR at 25-27, 31-35.  Subsequently, the State filed a motion to revoke Petitioner's community supervision alleging three violations of the terms of his probation.  CR 37, 39-41.  On November 29, 2006, following a probation revocation hearing, the court revoked Petitioner's probation and reinstated the eight-year sentence originally entered.

Petitioner's conviction was affirmed by the Seventh Court of Appeals of Texas on October 2, 2007. Duhon v. State, No. 07-07-0064-CR, slip op. (Tex.App.– Amarillo 2007, no pet.).  By his own admission, Petitioner did not file a petition for discretionary review ("PDR").  Fed. Writ Pet. at 3.  On January 28, 2008, Petitioner filed an application for state writ of habeas corpus challenging his conviction.  SHCR-07 at 2, 6-11.  The trial court entered written findings recommending that relief be denied.  Id. at 166-169.  On August 5, 2009, the Texas Court of Criminal Appeals denied relief without written order.  Id. at cover.

---

[1] "CR" refers to the Clerk's Record of pleadings and documents filed with the trial court and "RR" refers to the reporter's record of trial proceedings.  "SHCR" refers to the written pleadings contained within Ex parte Duhon, No. 67,267-07 (Tex. Crim. App. 2009).

B.     **Factual Background**

The State summarized the evidence presented as follows.

The State's motion to revoke community supervision alleged in pertinent part that the appellant (1) committed a subsequent criminal offense on or about June 26, 2006, in that the appellant did intentionally enter a habitation without the effective consent of Ms. Kecia Jalalizadeh, the owner, and with intent to commit an assault; (2) committed a subsequent criminal offense on or about June 26, 2006, in that the appellant did intentionally and knowingly cause bodily injury to Kecia Jalalizadeh by slapping her with his hand; and (3) failed to avoid the use of all narcotics, habit forming drugs, alcoholic beverages, and controlled substances on or about June 26, 2006. CR 37.

At the revocation hearing, the appellant admitted that he was the same person placed on community supervision in this cause. RR1:3. The appellant pleaded "not true" to all allegations in the state's motion to revoke community supervision. RR1:4-5.

Ms. Kecia Jalalizadeh, who lived in the residence in question, testified that she and the appellant and the appellant's wife lived together before the appellant assaulted his wife and was placed on felony probation. RR1:6-7. Following the assault by the appellant on his wife, Jalalizadeh moved into an efficiency apartment, which is where she resided on the date of the alleged violations of community supervision. RR1: 7-8. The appellant's wife brought some of her belongings over to Jalalizadeh's residence and stayed with her "for a little while." RR1:7. Jalalizadeh testified that the appellant never resided at the efficiency apartment and had visited only once following his release from jail. RR1:7-8. According to Jalalizadeh, the appellant did not stay over because her boyfriend did not want the appellant to sleep at her residence. RR1:8. On the night of June 25, 2006, her boyfriend had been visiting, and had been drinking, and left. In her haste to follow him so that she could drive him home, Jalalizadeh left her residence door unlocked. RR1:8-9.

According to Jalalizadeh, when she returned to her residence the next day, on June 26, the appellant was in her apartment and he smelled strongly of alcohol. RR1:8-9. The efficiency smelled strongly of alcohol as well. RR1:9. The appellant told Jalalizadeh that he had drunk two pints of liquor. She testified that he was "staggering, slurring, obviously drunk." RR1:9. She noticed that at least one pint of liquor that she had was "mostly gone." RR1:10. She testified on cross-examination that the liquor did not belong to her and that she did not keep alcohol in the residence. RR1:16.

Jalalizadeh testified that, while the appellant was in her residence, he was yelling at her and acting "very hostile." RR1:10. The appellant demanded that Jalalizadeh contact his probation office to ask that the appellant be given permission to transfer his probation so that he could be closer to his family. RR1:10. She did so. RR1:10-11. Because she wanted to get ready to go to school, she then asked the appellant repeatedly to leave her residence. RR1:11. She testified that "[h]e was too drunk to do anything." RR1:11.

The testimony continues as follows:

> Q (Prosecutor): And what did he do after he wouldn't leave the apartment?
> A (Jalalizadeh): I continued to get ready for school because I had to go to school and that's when he grabbed me.
> Q: And where did he grab you?
> A: He grabbed me on my left wrist.
> Q: With what did he grab you?
> A: With his left hand.
> Q: And what did he do after he grabbed your wrist?
> A: He hit me in my left shoulder.
> Q: And when he grabbed your wrist and hit you on your shoulder did that cause you pain?
> A: He was grabbing my wrist very tightly, I mean where I had to pry his hand off my wrist so I can leave the apartment and call 911.
> Q: Describe to the Court a little bit about the strike, where did he strike you on your body?
> A: Right here.
> Q: On your left shoulder. And do you know what he used?
> A: This one.
> Q: His right hand. And kind of describe to the Court, was it just a tap or how would you describe it?
> A: It was like that.
> Q: And you heard the noise and felt the blow?
> A: Yes.

RR1:11-13

Jalalizadeh testified that she called her boyfriend to assist, and that they tried to roust the appellant and get him to leave the residence, but the appellant was not responding because he had passed out. RR1:13. Jalalizadeh and her boyfriend then called 9-1-1 and the police came to the scene and arrested the appellant. RR1:13.

During the hearing, Jalalizadeh identified a letter postmarked June 3, 2006, that the appellant had mailed to her from the Del Valle Jail following his earlier arrest for the assault on his wife for which he received community supervision. RR1:14-15; SX-1, CR64-65. She knew his handwriting because she had received perhaps forty letters from the appellant "when he was in jail the first time." She acknowledged that he had some affection for her. RR1:14.

On cross-examination, Jalalizadeh testified that the appellant's wife had stayed with her briefly but had not lived there. RR1:15-16. She denied that the appellant ever had permission to reside with her. RR1:16. She conceded that, on the day she found the appellant in the apartment, it would have been alright for the appellant to stay there, until he refused to leave because she wanted to get ready for school. RR1:16-17. She testified affirmatively in answer to a question of whether, when her boyfriend came to assist her, they called the police "after [the appellant] was leaving." RR1:17.

The appellant testified that Jalalizadeh gave him permission to live with her when he was released from jail and that this fact could be verified by reference to the pre-sentence report prepared by the probation authorities, which contained Jalalizadeh's telephone number.[2] RR1:18-19, 23-24, 27, 30. He testified that his mail was being delivered at the residence, including his check from Walmart, and that there would be records of numerous cell phone calls between him and the victim. RR1:19, 35. He also testified that, one and one-half weeks after he was released from jail, the probation officer gave him a travel permit to see his wife in Jasper. He stayed there 10 days and then returned to Jalalizadeh's residence. RR1:19, 22-23, 35. According to the appellant, he was living with Jalalizadeh and keeping his clothes there "until she threw them away." RR1:20. He testified that Jalalizadeh is "working as a stripper and drinks and does cocaine all the time and she ain't on her medicine." RR1:19. The appellant testified that he was taking "a bunch of different psych medicine," and that on the day of the incident, he "ate all [his] medicine" and went to sleep. When Jalalizadeh came home, she woke him up and he told her: "[P]lease leave me the hell alone" and testified further that he "was kind of rude about it and . . . went back to sleep." RR1:20. The next thing he remembered was when he woke up as the police were arresting him. RR1:21. He testified that he has spinal stenosis and that he was taking Flexerial, Norco, Methocarbamol, Elavil, Seroquel, Lithium, blood pressure medicine, and allergy medicine. RR1:21. He said that he took all the medicine at once because he was "afraid she was coming home drunk" and he "didn't want to have to put up with all that foolishness." RR1:21. He denied drinking alcohol or assaulting Jalalizadeh. R1:21-22, 26. The appellant testified that in the letter he wrote Jalalizadeh, he was apologizing for being rude to her. RR1:25-26.

---

[2] The pre-sentence investigation report was not introduced by the appellant or by the State.

>       Before the conclusion of the hearing, the appellant's counsel recalled the appellant to the stand. He testified that the reason that Jalalizadeh told the probation officer that the appellant was not living with her was because he and Jalalizadeh were not getting along at that point. RR1:33. He said that Jalalizadeh's address was the one that the jail authorities verified as his when he was released from jail in May before he received the permit to travel to Jasper. RR1: 33-34. He testified that on May 25 when he was released from jail he was living with Jalalizadeh and that Jalalizadeh initially screened the probation officer's telephone call and then contacted the appellant to ask him what he wanted her to tell the officer. RR1:34. The appellant testified that he told the probation officer he was homeless because he was trying to get permission to have his probation transferred to Jasper. RR1:34.

State's Brief at 2-8 (footnote in original).

**C.**     **Petitioner's Grounds for Relief**

In his original application for habeas corpus relief Petitioner raises the following grounds for relief:

    1.     his probation was improperly revoked;

    2.     his sentence is illegal;

    3.     there was insufficient evidence to uphold his probation revocation;

    4.     he was denied effective right to trial counsel; and

    5.     he was denied his right to a fair revocation hearing.

Fed. Writ Pet. at 7-8.[3]

In his brief in support of the application Petitioner appears to also raise a claim of ineffective assistance of appellate counsel. Brief at 3. Petitioner asserts his lawyer "did next to nothing" on his appeal. Id.

---

[3] Duhon inserted two (2) pages between pages 7 and 8 of the form petition. The undersigned will refer to these pages as "7a" and "7b."

In his amendment to his "Rebuttal with Brief in Support" Petitioner raises an additional claim that he was not provided with a preliminary hearing in his case. Amendment at 1. He contends this violated his due process rights. Id.

**D.     Exhaustion of State Court Remedies**

Respondent does not contest that Petitioner has exhausted his state court remedies regarding the claims brought in Petitioner's original application. A review of the state court records submitted by Respondent shows that Petitioner has properly raised these claims in previous state court proceedings.

Petitioner did not, however, raise in state court his claim that he was denied effective assistance of appellate counsel or his claim that he was denied a preliminary hearing. Petitioner's unexhausted claims are procedurally barred. A subsequent state application for habeas corpus on Petitioner's unexhausted issues would be futile as it would be dismissed pursuant to TEX. CODE CRIM. PROC. ANN. art. 11.07, § 4 as an abuse of the writ. When a state court decision rests on a state law ground that is independent of a federal question and adequate to support the judgment, federal courts lack jurisdiction to review the merits of the case. Coleman v. Thompson, 501 U.S. 722, 729, 111 S. Ct. 2546, 2553 (1991). In order for a claim of procedural default to preclude federal review of a habeas petitioner's claim, the last state court issuing a reasoned decision must have clearly and unequivocally relied upon the procedural default as an independent and adequate ground for denying relief. Harris v. Reed, 489 U.S. 255, 262, 109 S. Ct. 1038, 1043 (1989). Additionally, even though a claim has not been reviewed by the state courts, this Court may find that claim to be procedurally barred. Coleman, 501 U.S. at 735, 111 S. Ct. at 2557. The general rule that a state court must explicitly apply a procedural bar to preclude federal review does not apply to those cases where a

petitioner has failed to exhaust his state court remedies and the state court to which he would be required to present his unexhausted claims would now find those claims to be procedurally barred. Id. at n.1.  However, a petitioner can still obtain federal habeas review on a claim denied by the state court on the grounds of procedural default if he can show cause and actual prejudice for his procedural default or that a failure to address the merits of the federal claim would result in a miscarriage of justice.  Moore v. Roberts, 83 F.3d 699, 702 (5th Cir. 1996), citing Coleman, 501 U.S. at 750, 111 S. Ct. 2565, cert. denied, 519 U.S. 1093, 117 S. Ct. 773 (1997).  Petitioner has failed to show cause and actual prejudice for his procedural default and has made no showing that a failure to address the merits of the federal claims would result in a miscarriage of justice. Therefore, Petitioner is barred from raising his unexhausted claims.

## DISCUSSION AND ANALYSIS

**A.     The Antiterrorism and Effective Death Penalty Act of 1996**

The AEDPA radically altered the standard of review by this Court in federal habeas corpus proceedings filed by state prisoners pursuant to Title 28 U.S.C. § 2254.  Under the AEDPA's standard of review, the Court cannot grant Petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the U.S. Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, 28 U.S.C. § 2254(d)(1)-(2).

The "contrary to" requirement "refers to the holdings, as opposed to the dicta, of ... [the Supreme Court's] decisions as of the time of the relevant state-court decision." Dowthitt v. Johnson,

230 F.3d 733, 740 (5th Cir. 2000) (quoting (Terry) Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 1523 (2000)).  The inquiry into whether the decision was based on an "unreasonable determination of the facts" constrains a federal court in its habeas review due to the deference it must accord the state court.  See id.

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by ... [the Supreme Court] on a question of law or if the state court decides a case differently than ... [the Supreme Court] has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from ... [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id. at 740-41.

Section 2254(d)(2) speaks to factual determinations made by the state courts.  See 28 U.S.C. § 2254(e)(1).  While we presume such determinations to be correct, the petitioner can rebut this presumption by clear and convincing evidence.  See id.  Absent an unreasonable determination in light of the record, we will give deference to the state court's fact findings.  See id. § 2254(d)(2).  With these principles in mind, this Court must now turn to the issues raised by the pleadings in this cause.

**B.     Revocation Hearing**

Petitioner alleges that his probation was improperly revoked because he was "violated using charges [he] was not convicted of which were later dropped." Fed. Writ Pet. at 7.  In addition, Petitioner claims that he was denied the right to a fair revocation hearing because the "judge refused to allow [him] to speak in [his] own behalf," the State was "allowed to [sic] many resets," and he "was not allowed to question witness" or present his evidence.  Id. at 8.  Finally, Petitioner contends

that his sentence is illegal because he was "never convicted of any crime yet they violated [his] probation. When the charges were dropped [his] probation should have been reinstated."

Petitioner raised these same claims in his state application for habeas corpus relief. The state court issued detailed findings of fact and conclusions of law. SHCR-07 at 166-69. Specifically the state habeas court concluded:

> [T]his Court finds that there is no basis in law for applicant's argument that the trial court is prohibited from revoking his community supervision because the State did not prosecute him on the alleged violations of burglary of a habitation and assault/bodily injury. The Texas statute in effect did not require the State to restrict its allegations of violations of community supervision to final convictions, but allowed the State to file allegations related to violations of any of the conditions of probation. Tex. Code Crim. Proc. art 42.12, § 21(a) and (b) (LEXIS 2006). . . .
>
> In sum, this Court finds that the fact that applicant was not criminally prosecuted for burglary of a habitation and assault/bodily injury did not preclude the trial court from considering during an administrative hearing evidence of the criminal conduct underlying the alleged violation and revoking his community supervision. Appellant's claim that the trial court abused its discretion in revoking his probation in not valid.

Id. at 167-68. The state court also rejected Petitioner's claim that the decision to revoke was based on the complainant's perjured testimony and the State knew the charges were false.

"It is well established that due process must be afforded probationers in connection with the revocation of probation." Jones v. Johnson, 230 F.3d 825, 827 (5th Cir. 2000) (citing Gagnon v. Scarpelli, 411 U.S. 778, 782, 93 S. Ct. 1756 (1973)). "The Due Process Clause of the Fourteenth Amendment imposes procedural and substantive limits on the revocation of the conditional liberty created by probation." Black v. Romano, 471 U.S. 606, 610, 105 S. Ct. 2254 (1985) (citing Bearden v. Georgia, 461 U.S. 660, 666 & n. 7, 103 S. Ct. 2064 (1983)). At a probation revocation hearing, the probationer must be given an opportunity to be heard and to show, if possible, that he did not

violate the conditions, or if he did, that mitigating circumstances suggest that the violation does not warrant revocation.  United States v. Turner, 741 F.2d 696, 697 (5th Cir. 1984) (citing Morrissey v. Brewer, 408 U.S. 471, 489, 92 S. Ct. 2593 (1972)).

It is settled that revocation proceedings need only meet the "minimum requirements of due process" by providing the following procedural safeguards:

1. written notice of claimed violations of probation;

2. disclosure to the probationer of evidence against him;

3. opportunity to be heard in person and to present witnesses and documentary evidence;

4. the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds a good cause for not allowing confrontation);

5. a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and

6. a written statement by the fact finders as to the evidence relied on and reasons for revoking probation.

Gagnon v. Scarpelli, 411 U.S. 778, 781, 93 S. Ct. 1756 (1973) (quoting Morrissey, 408 U.S. at 489); see also Williams v. Johnson, 171 F.3d 300, 304 (5th Cir.), cert. denied, 528 U.S. 882, 120 S. Ct. 197 (1999).

As explained by Respondent, the record reflects that Petitioner received a probation revocation hearing which fulfilled the due process requirements of Morrissey.  During the revocation hearing, Petitioner admitted that he had received copies of the State's Motion to Revoke Probation and he admitted that he understood the allegations contained in the motion. 1 RR 3-5.  The State presented the testimony of Kecia Jalalizadeh and a letter from Petitioner to Jalalizadeh as evidence to support the grounds for revocation.  1 RR 5-17; SX 1.  The record does not reflect that Petitioner

11

was denied any opportunity to present witnesses, nor does it reflect that the court was not a neutral decision maker. See generally, 1 RR 3-35. Finally, the judgment adjudicating guilt reflects the reasons for revoking probation and the court's finding after reviewing the evidence presented by the State and Petitioner. See CR at 45-46; see also 1 RR 35. Having independently reviewed the entire state court record, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence with regard to Petitioner's claims that his probation was improperly revoked, his sentence is illegal, and that he was denied a fair revocation hearing.

**C.     Sufficiency of the Evidence**

In a related claim, Petitioner complains the evidence was insufficient to support the revocation decision. The state habeas court concluded the issue was fully considered on direct appeal and there was no need to review the claim. SHCR-07 at 168. The state habeas court additionally concluded that evidence of only one allegation of violation is sufficient to sustain the trial court's decision to revoke probation. Id. at 169.

Probation revocations are not subject to a reasonable-doubt standard. According to Texas law, a probation revocation proceeding is neither a criminal nor a civil trial, but an administrative hearing. Bradley v. State, 564 S.W.2d 727, 729 (Tex. Crim. App. 1978). To warrant revocation, the State need only establish by a preponderance of the evidence that a defendant violated the terms of his probation. Cobb v. State, 851 S.W.2d 871, 873 (Tex. Crim. App. 1993). The State satisfies this burden when the greater weight of the credible evidence presented creates a reasonable belief that a condition of probation has been violated as alleged. Martin v. State, 623 S.W.2d 391, 393 n. 5 (Tex. Crim. App. 1981).

According to the United States Supreme Court, the revocation of probation passes constitutional muster under the Fourteenth Amendment Due Process Clause as long as it is not "totally devoid" of evidentiary support. Douglas v. Buder, 412 U.S. 430, 432, 93 S. Ct. 2199 (1973) (per curiam). A review of the revocation hearing transcript shows that there was ample proof presented to satisfy the State's burden to show that the petitioner violated the terms of his probation. See SHCR-07 at 127-60; 1 RR 3-35; SX 1. Because the record is not totally devoid of evidence, this is sufficient to meet the burden of proof required for the revocation of probation under the Fourteenth Amendment Due Process Clause. Petitioner fails to establish that the State did not meet its burden of proof or that his probation was revoked without sufficient evidence. Likewise, he fails to demonstrate that the state habeas corpus court's decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. Accordingly, Petitioner is not entitled to federal habeas corpus relief on this issue.

**D.     Ineffective Assistance of Counsel**

Petitioner argues he was denied effective assistance of counsel at the probation revocation proceeding. Petitioner presented the same claim in his state application for habeas corpus relief. The state habeas court determined that Petitioner provided only conlcusory claims regarding additional evidence that counsel could have presented or additional investigation that counsel could have performed. SHCR-07 at 169. The state court concluded that Petitioner had not shown that counsel's representation fell below an objective standard of reasonableness or that he suffered actual prejudice. Id.

Ineffective assistance of counsel claims are analyzed under the well-settled standard set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant can make both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id. at 687, 104 S. Ct. at 2064. In deciding whether counsel's performance was deficient, the Court applies a standard of objective reasonableness, keeping in mind that judicial scrutiny of counsel's performance must be highly deferential. Id. at 686-689, 104 S. Ct. 2064-65. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689, 104 S. Ct. at 2065. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (Citation omitted). Ultimately, the focus of inquiry must be on the fundamental fairness of the proceedings whose result is being challenged. Id. at 695-97, 104 S. Ct. at 2069. Accordingly, in order to prevail on a claim of ineffective assistance of counsel, a convicted defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 687, 104 S. Ct. at 2064.

Respondent argues that Petitioner has not shown that he had a right to counsel at his revocation proceedings. He concedes, however, there is a limited right to counsel in the probation

revocation context under Gagnon v. Scarpelli, 411 U.S. 778, 787-91 (1973).  Respondent notes that Petitioner has failed to produce any Supreme Court authority that establishes the level of representation to which he was entitled during the revocation proceedings.  Nevertheless, he applies the Strickland analysis "in the interest of disposing" of Petitioner's claims on the merits.

The Court need not determine whether Strickland provides the applicable Supreme Court precedent for determining whether counsel rendered ineffective assistance.  If Petitioner's claims of ineffective assistance fail under Strickland, they would necessarily fail under any lesser standard which might apply in the present context.  Thus, in the interests of judicial economy, the Court proceeds to review Petitioner's claims under the standard in Strickland.

In this case Petitioner has failed to demonstrate counsel performed deficiently.  Petitioner has not overcome the strong presumption that his attorney's conduct falls within the wide range of reasonable assistance.  In addition, Petitioner presents nothing more than a laundry list of conclusory assertions.  "[A]bsent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his pro se petition, unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value."  Ross v. Estelle, 694 F.2d 1008, 1011 (5th Cir. 1983).  Finally, Petitioner has failed to demonstrate that he was prejudiced by counsel's alleged ineffectiveness. Having independently reviewed the entire state court record, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence.  Accordingly, the Court is of the opinion that 28 U.S.C. § 2254, as amended by the AEDPA, bars habeas corpus relief on Petitioner's claim that he received ineffective assistance of counsel.

## RECOMMENDATION

It is recommended that Petitioner's application for writ of habeas corpus be denied.

## CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, effective December 1, 2009, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in Slack v. McDaniel, 529 U.S. 473, 484, 120 S. Ct. 1595 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Id. "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id.

In this case, reasonable jurists could not debate the dismissal or denial of the Petitioner's section 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. Miller-El v. Cockrell, 537 U.S. 322, 327, 123 S. Ct.

1029 (2003) (citing Slack, 529 U.S. at 484). Accordingly, it is respectfully recommended that the Court shall not issue a certificate of appealability.

## OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. Battles v. United States Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140, 150-153, 106 S. Ct. 466, 472-74 (1985); Douglass v. United Servs. Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

To the extent that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 1st day of July, 2010.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE